**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------X
INSTINET INCORPORATED, INSTINET          :
HOLDINGS INCORPORATED, INSTINET GROUP,   :
LLC, and INSTINET, LLC,                   :
                                          :
                         Plaintiffs,     :
                                          :      <u>**Opinion and Order**</u>
           -against-                      :      08-cv-7141 (JFK)
                                          :
                                          **:**
ARIEL (UK) LIMITED,                       :
                                          :
                         Defendant.      :
----------------------------------------X
        <u>APPEARANCES</u>:

        FOR PLAINTIFFS INSTINET INCORPORATED, INSTINET HOLDINGS
        INCORPORATED, INSTINET GROUP, LLC, and INSTINET, LLC:

                Robert L. Sills, Esq.
                Rishona Fleishman, Esq.
                ORRICK, HERRINGTON & SUTCLIFFE LLP

        FOR DEFENDANT ARIEL (UK) LIMITED:

                J. Joseph Bainton, Esq.
                SMITH, GAMBRELL & RUSSELL, LLP

**JOHN F. KEENAN, United States District Judge:**


        This action arises from a dispute regarding the scope of

defendant Ariel (UK) Limited's ("Ariel" or "Defendant") rights

in the computerized securities trading software developed by the

plaintiff Instinet entities (collectively "Instinet" or

"Plaintiff") pursuant to a series of licensing agreements signed

in the 1970's.  Ariel contends that the nearly 35-year-old

licensing agreements provide it the right to use and grant non-

exclusive sub-licenses in the technology underlying Instinet's current trading platform. On August 11, 2008, Instinet commenced the instant action seeking a declaratory judgment to the effect that Ariel has no rights in Instinet's current technology. Before the Court is Instinet's motion for summary judgment. For the reasons that follow, the motion is granted in part, and denied in part.

## I. BACKGROUND

Instinet is a successor in interest to Institutional Networks Corporation ("INC"), which was founded in 1969 to develop and operate a computerized trading system for securities. Ariel is a British company established in 1971 by a group of London-based merchant banks which also sought to establish a computerized trading system that could trade blocks of stock between large institutions.

In or around 1970, Instinet obtained both European and American patents on an early computerized securities trading system (the "Instinet System"). Ariel was then attempting to develop its own trading system (the "Ariel System"). Ariel was concerned that Instinet's European patents could be an obstacle to the development of the Ariel System and thus it entered into a licensing agreement with Instinet on August 11, 1972, under which Ariel could develop its own computerized securities trading system based on the design of the Instinet System (the

"1972 Agreement").   In return, Ariel agreed to pay Instinet specified licensing fees and royalties.   Both parties agreed to disclose to each other all improvements and enhancements relating to the Instinet System, whether patentable or unpatenable, developed by either of them during the term of the agreement.   The 1972 Agreement had a term of 14 years, subject to certain conditions that would provide Ariel licensing rights under the agreement in perpetuity.

Some time after the execution of the 1972 Agreement, Ariel and Instinet began working together, in conjunction with a third-party vendor named Datasynteks, to develop a new version of the Instinet System (the "Instinet II System" or "Instinet Two System").   According to Ariel, its role in this project was to "develop and deliver to Instinet the definitions and the specifications of the messaging between the information backbone and the trading engine." (Ariel 56.1 Response Statement ¶ 21.)

On or about December 24, 1975, Ariel sent a proposal to Instinet's attorney by cable to renegotiate the 1972 Agreement (the "Proposal").   Under the terms of the Proposal, Ariel would pay Instinet $175,000 provided that, among other things, Ariel would receive "a non-exclusive license in all those territories where Instinet has patents granted or pending" and "full and unencumbered access to and right to make use of the Instinet Two System and documentation on same terms as though [the 1972

Agreement] were still in force." (Pl. Ex. H.)  The Proposal was subject to the condition that the parties' attorneys would "draw up such legal documentation . . . as will give effect to the preceding agreement and conditions." (Id.)

On December 26, 1975, Instinet responded by telex, accepting the offer on the "terms set forth in [the] Ariel cable." (together with the Proposal, "the Cable Agreement"). In the telex, Instinet also urged that Ariel's lawyers "send confirming papers [to Instinet's lawyers] soonest." (Id.)

In or about April 1976, the parties finalized their agreement by signing a written contract with an effective date of December 31, 1975. (the 1975 Agreement").  The 1975 Agreement provided that the 1972 Agreement "be treated as terminated" after the effective date, "on the basis the obligations of both parties . . . shall wholly cease on that date." (Def. Ex. I § 4(1).)

The parties' disagreement in the instant litigation pertains to the scope of Ariel's rights under the 1975 Agreement.  The Cable Agreement expressly stated that Ariel would maintain the same rights in the Instinet II System as if the 1972 Agreement were still in effect.  On the other hand, the 1975 Agreement does not refer to the Cable Agreement, and refers to the 1972 Agreement only to the extent that it expressly terminates it.  The 1975 Agreement provides Ariel a non-

exclusive, world-wide license to exploit the "Know-how,"
"Patents," and "Future Patents" pertaining to the Ariel,
Instinet, and Instinet II Systems.

"Know-how," as defined in the 1975 Agreement, "means and
includes all know-how[,] documentation[,] information[,]
procedures[,] knowledge[,] experience[,] and data: (a) developed
up to 31st December 1975 by or for Instinet or Ariel and which
relates in any way to the Instinet System[,] the Ariel System[,]
and the Instinet Two System[;] and (b) developed after 31st
December 1975 but prior to 30th June 1976 by Instinet in
conjunction with Ariel and Datasynteks and which relates in any
way to the Instinet Two System." (Id. § 1.)

"Patents" are defined in the 1975 Agreement as "all
patents or similar forms of protection in any part of the world"
which relate to the Ariel System, Instinet System, and Instinet
II System "of which Instinet or Ariel is the proprietor at the
time of the signature hereof." (Id.) (emphasis added). "Future
Patents" are defined to include patent applications, and patents
issued pursuant to such applications, that "cover" the Ariel
System, the Instinet System, or the Instinet II System and were
pending at the time of the contract's execution or filed
thereafter. (Id.)

On June 30, 1976, David Manns, an author of the Instinet II
System, left his employment at Ariel and began working at

Instinet on or about the next day, July 1, 1976. It is undisputed that David Manns's departure from Ariel to Instinet terminated the working relationship between the two firms. The Instinet II System was not complete as of that date, however; it began commercial operation in or about September 1976.

In 1996, roughly 20 years later, Ariel sent letters to both Instinet and Reuters, the majority owner of Instinet at the time, requesting a meeting with their representatives regarding the status of its rights pursuant to the 1975 Agreement. Instinet declined Ariel's request. In October 2003, Ariel engaged Origin Limited ("Origin") to provide an opinion on the validity of Ariel's intellectual property rights. On March 22, 2005, Origin, on behalf of Ariel, sent a demand letter to Instinet and Reuters, requesting "assurance that [they] will honour [their] obligations to Ariel" under the 1975 Agreement. (Pl. Ex. K, at 4.) Representatives for Instinet and Reuters again rejected Ariel's demand.

In November 2005, Ariel brought an action in this Court against Instinet and other defendants for copyright infringement, declaratory relief, and breach of contract based on Instinet's use of Ariel's technology pursuant to the 1975 Agreement. On October 31, 2006, this Court issued an opinion and order dismissing the copyright claim with prejudice on the grounds that defendants held licenses to use that technology.

See Ariel (UK) Ltd. v. Reuters Group PLC, No. 05 Civ. 9646, 2006 WL 3161467 (S.D.N.Y. Oct. 31, 2006), aff'd 277 F. App'x 43 (2d Cir. 2008). The Court also declined to exercise supplemental jurisdiction over the remaining state law claims, dismissing them without prejudice. Id. at *10-11.

In June 2008, Ariel sent a demand letter to Instinet, claiming that it has a right of ingress in Instinet's current trading technology and software.

On August 11, 2008, Instinet commenced this action seeking a declaratory judgment addressing the rights and obligations of the parties.   Instinet requests the Court to declare: (a) "[t]hat the 1975 Agreement terminated the 1972 Agreement in its entirety"; (b) "[t]hat pursuant to the 1975 Agreement, the technology and software being licensed to Ariel is limited to such technology and software as it existed no later than June 30, 1976"; (c) "[t]hat Ariel has no rights in or to Instinet's current technology or software"; and (d) "[t]hat Ariel does not have any of the rights claimed in the Demand Letter, whether pursuant to the 1972 Agreement, the 1975 Cable Agreement, the 1975 Agreement, or otherwise." (Compl. ¶ 26.)

On November 5, 2008, Ariel filed an action in Supreme Court, New York County, asserting similar claims to those made in the June 2008 demand letter.   That action has been stayed, upon consent, pending the resolution of the instant matter.

On September 9, 2009, Instinet filed the instant motion for summary judgment, asserting that the 1975 Agreement is both integrated and unambiguous, and thus it is entitled to the requested declaratory relief as a matter of law. Further, Instinet argues that Ariel's claims are barred by laches.

## II.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

In determining whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255. To defeat a summary judgment motion, the nonmoving party must do "more than simply show that there is some metaphysical doubt as to the material facts," Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586
(1986), and "may not rely on conclusory allegations or
unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105,
114 (2d Cir. 1998).  Where it is clear that no rational finder
of fact "could find in favor of the nonmoving party because the
evidence to support its case is so slight," summary judgment
should be granted. Gallo v. Prudential Residential Servs., Ltd.,
22 F.3d 1219, 1224 (2d Cir. 1994).

## B. Parol Evidence Rule

Instinet seeks a declaratory judgment to the effect that
Ariel has no rights to Instinet's current securities trading
technology under the 1975 Agreement or its predecessors.  It
construes the 1975 Agreement to limit Ariel's right to exploit
the technology it helped develop in conjunction with Instinet to
the technology in existence as of June 30, 1976.  Ariel
maintains that the parties' agreement, as evidenced by the 1975
Agreement in conjunction with the Cable Agreement and the 1972
Agreement, was that Ariel has a perpetual license to use and
grant sub-licenses to Instinet's securities trading platform and
all improvements and modifications.

The Court therefore must first determine whether New York's parol evidence rule precludes it from considering extrinsic documents in interpreting the 1975 Agreement.[1]

New York courts have recognized that "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." W.W.W. Assocs., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990). Thus, the parol evidence rule generally prohibits the use of extrinsic evidence, both oral and written, "to explain, modify, vary, or supplement 'the meaning of a contract that the parties have reduced to an unambiguous integrated writing.'" Comprehensive Habilitation Servs., Inc. v. Commerce Funding

---

[1]    The 1975 Agreement does not contain a choice-of-law provision.    In determining which law applies to the 1975 Agreement between Ariel, a U.K. company, and Instinet, a U.S. company, a federal court sitting in diversity applies the choice of law rules of the state in which it sits, in this case New York.    In contract cases, New York courts apply a flexible "center of gravity" or "grouping of contacts" approach, pursuant to which "courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir. 1997); see also Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 583 (2d Cir. 2006).    There is little in the record on which the Court can make a "center of gravity" determination, but both parties cite New York law and do not dispute its application. The Court thus applies New York law here because "in the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied." Walter E. Heller & Co. v. Video Innovations, Inc., 730 F.2d 50, 52 (2d Cir. 1984).

Corp., No. 05 Civ. 9640, 2009 WL 935665, at *14 (S.D.N.Y. Apr. 7, 2009) (quoting Gualandi v. Adams, 385 F.3d 236, 241 (2d Cir. 2004)).

The parol evidence rule only applies to integrated contracts, meaning that "the parties intend[ed] it to constitute the complete and final expression of their agreement." Starter Corp. v. Converse, Inc., 170 F.3d 286, 295 (2d. Cir. 1999). The terms of an integrated agreement may still be ambiguous, though, and "[i]n such cases, it is proper to consider extrinsic evidence in interpreting the ambiguous terms, irrespective of the parol evidence rule." Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 69 (2d Cir. 2008).

"The issues of whether a written agreement is integrated and whether any of its terms are ambiguous are questions of law for the court to decide." Joseph Victori Wines, Inc. v. Vina Santa Carolina S.A., 933 F. Supp. 347, 352 (S.D.N.Y. 1996); see also Woodling v. Garrett Corp., 813 F.2d 543, 552 (2d Cir. 1987). If the contract is unambiguous, its meaning is likewise a question of law. See Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 66 (2d Cir. 2000).

The Court thus follows a three-step process to interpret the 1975 Agreement: it must "(i) determine whether the written contract is an integrated agreement; if it is, (ii) determine whether the language of the written contract is clear or is

ambiguous; and, (iii) if the language is clear, apply that clear language." Myskina v. Conde Nast Publ'ns, Inc., 386 F. Supp. 2d 409, 415 (S.D.N.Y. 2005).   If the language is ambiguous and there is extrinsic evidence of the contract's meaning, then determining the meaning of such ambiguous language is an issue of fact for the jury. See Revson, 221 F.3d at 66.

### 1. Is the 1975 Agreement Integrated?

The Court must first determine whether the 1975 Agreement is an integrated contract.   Where, as here, the contract at issue lacks an integration clause, the Court must "determine whether the parties intended their agreement to be an integrated contract by reading the writing in light of the surrounding circumstances."   Starter, 170 F.3d at 295.   Relevant considerations include:

> whether the document in question refers to the oral agreement, or whether the alleged oral agreement between the parties is the sort of complex arrangement which is customarily reduced to writing; whether the parties were represented by experienced counsel when they entered into the agreement; whether the parties and their counsel negotiated during a lengthy period, resulting in a specially drawn out and executed agreement, and whether the condition at issue is fundamental; if the contract, which does not include the standard integration clause, nonetheless contains wording like 'in consideration of the mutual promises herein contained, it is agreed and covenanted as follows' and ends by stating that 'the foregoing correctly sets forth your understanding of our Agreement.'

<u>Adler & Shaykin v. Wachner</u>, 721 F. Supp. 472, 477 (S.D.N.Y.
1988) (quotations omitted).

Despite the lack of an integration clause, the 1975
Agreement appears to include the full agreement of the parties.
The 1975 Agreement spans nine pages and contains recitals,
definitions, the signatures of the parties, a corporate seal, a
government stamp and ribbon, and the mutual rights and
obligations of each party.  The 1975 Agreement does not refer to
the Cable Agreement, and only refers to the 1972 Agreement to
the extent it expressly terminates it.

The fundamental purpose of the 1975 Agreement was to define
the scope of Ariel's intellectual property rights in the
technology that it developed in conjunction with Insinet.  If
any other document or oral agreement supplemented or varied
Ariel's rights to make use of that technology, it would be
expected that such an agreement would be referenced or otherwise
reduced to writing.

Furthermore, Ariel and Instinet both were represented by
regarded and experienced counsel from the financial capitals of
the world, London and New York, respectively.  The 1975
Agreement was executed over four months after the parties agreed
in principle to renegotiate the 1972 Agreement.  The delay in
reducing the agreement to writing and the presence of able
counsel belie the suggestion that the 1975 Agreement was drafted

hastily and somehow inadvertently fell short of encompassing the parties' full agreement.

Accordingly, the Court holds that the 1975 Agreement is a fully-integrated contract.

### 2. Is the 1975 Agreement Ambiguous?

"The language of a contract is not made ambiguous simply because the parties urge different interpretations." Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992). "[T]he presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence." Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 236 (2d Cir. 2008). Contractual language is not ambiguous if it has "a definite and precise meaning, unattended by danger or misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1278 (2d Cir. 1989) (quotation and modification omitted). On the other hand, ambiguous language is that which is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Revson, 221 F.3d at 66 (quoting Seiden, 959 F.2d at 428).

The 1975 Agreement is far from a model of clarity. The drafters were averse to the use of punctuation and their liberal use of defined terms cause the contract to read like a coded message. Ariel seeks to condemn the 1975 Agreement as ambiguous because of this maze of defined terms, concluding, as counsel put it at oral argument, that it "makes no sense" and is "one of the worst documents of its character" that he has seen in his career. (Feb. 11, 2010 Oral Arg. Tr. at 16-17.)

Complexity does not necessarily create ambiguity. Ariel directs the Court to only one aspect of the 1975 Agreement — the defined term "Future Patents" — which it believes is capable of more than one meaning. In its brief, Ariel obfuscated the definition by omitting material clauses in favor of an ellipsis, and, at oral argument, deemed it ambiguous because it includes both the defined term "Patents" and the non-defined term "patents." The definition of "Future Patents" is not especially simple, but neither is it ambiguous. It is clear that the use of the non-defined term "patents" was used to refer to patents obtained from applications filed after the execution of the 1975 Agreement that cover the Ariel, Instinet, and Instinet II Systems. Such patents are outside the scope of the defined term "Patents," thus the reason for the distinction.

Ariel's other arguments are unavailing because the Court must review the agreement for ambiguity without reference to

extrinsic evidence.  Overall, despite the complexity of the 1975 Agreement, a careful and thorough reading of its language can only lead to one reasonable interpretation of its meaning.  The Court thus holds that the 1975 Agreement is unambiguous.

### 3.  Application of the Unambiguous Language

The Court holds that the 1975 Agreement is both integrated and unambiguous, and thus it is now tasked with applying its meaning.

Instinet's first prayer for relief asks the Court to declare that the 1975 Agreement terminated the 1972 Agreement in its entirety.  Section 4(1) of the 1975 Agreement clearly provides that the 1972 Agreement "shall be treated as terminated with effect on 31st December 1975 on the basis that the obligations of both parties thereunder . . . shall wholly cease on that date so that there shall be no continuing obligations thereunder." (Pl. Ex. I § 4(1).)  Instinet's first prayer for relief thus is granted.

The second prayer for relief addresses whether Ariel has any right to exploit Instinet's technology developed after June 30, 1976.  In Ariel's June 12, 2008 demand letter and its opposition to the instant motion for summary judgment, Ariel maintains that its rights in the Instinet II System under the 1975 Agreement run in perpetuity and thus encompass Instinet's

current technology.[2]  The provisions of the 1975 Agreement relevant to Ariel's rights to the Instinet II System, Sections 5(1), 5(2), and 5(4), collectively provide Ariel (a) full and unencumbered access, and the right to make use of the "Instinet Two System" without payment of any kind, and (b) the right to grant non-exclusive licenses, in any part of the world, in the "Know-how," "Patents," and "Future Patents" of the "Instinet Two System."

The defined terms within those provisions make clear that Ariel has no right to the technology developed by Instinet after June 30, 1976.  First, Ariel's rights to the "Know-how" and "Patents" of the Instinet II System are limited temporally by definition to include only the technology that existed as of the execution of the 1975 Agreement.

Moreover, "Future Patents" is limited in the 1975 Agreement only to include (1) patents or similar forms of protection that cover the Instinet System, Ariel System, or Instinet II System

_____

[2]  The 1975 Agreement also addresses the parties' rights in the Ariel System and Instinet System.  The Instinet System "means the computerized communications system which executes transactions in securities and which Instinet now operates." (Pl. Ex. I § 1.) (emphasis added).  Likewise, the Ariel system "means the computerized communications system for dealing in securities and providing information services relating to such dealings as now operated by Ariel." (Id.) (emphasis added).  If Ariel were to argue that it has a right to Instinet's current technology based on its rights in the Ariel System or Instinet System, that argument would also fail as it is clear that its rights are limited to the technology underlying those systems as they existed as of the date the 1975 Agreement was executed.

that were issued pursuant to applications that were pending at the time the 1975 Agreement was executed, and (2) all patents or similar forms of protection obtained from "such applications" — that is all patents that "cover" the three aforementioned technology systems — filed after the execution of the 1975 agreement. (Id. § 1.)   It is undisputed that there were no patents obtained by the parties that fall into the former category.   Therefore, Ariel's license in Instinet's technology developed after June 1976 is limited to the latter category, i.e., patents obtained from applications made after the signing of the 1975 Agreement that cover the Instinet II System.   The issue thus becomes whether a patent that covers technology developed by Instinet after June 30, 1976 covers the Instinet II System as it is defined in the 1975 Agreement.

The "Instinet Two System," pursuant to the 1975 Agreement,

> "means the system documentation procedures programs and data for executing transactions in securities developed by Instinet in conjunction with Ariel and Datasynteks and includes the system documentation procedures programs and data as at 31st December 1975 together with all modifications thereof made prior to 30th June 1976 required to place the Instinet Two System into commercial use in accordance with the functional specifications now in effect or being implemented."

(Id.) (emphasis added).   Instinet interprets this definition to mean that the Instinet II System is limited to all improvements made prior to June 30, 1976, and thus all patent applications

made after that date are outside the scope of the 1975
Agreement.  This is not necessarily true.  Instinet ignores the
Agreement's use of "means" and "includes."  The "Instinet Two
System" includes modifications prior to June 30, 1976, but is
not necessarily limited by that date.  Rather, the broader
definition for the "Instinet Two System" — that is, what it
"means" — is the system documentation, procedures, programs, and
data for executing transactions in securities developed by
Instinet in conjunction with Ariel and Datasynteks.  It is a
distinction without a difference, though, as the parties agreed
at oral argument that the working relationship between Ariel and
Instinet ceased on June 30, 1976, the date David Manns switched
employers from Ariel to Instinet. (Feb. 11, 2010 Oral Arg. Tr.
at 21.)

In sum, Ariel has a license to use and grant sublicenses to
the "Know-how" and "Patents" underlying the Instinet II System
in existence at the time the 1975 Agreement was executed.  It
also has a right to exploit the patents obtained by Instinet (1)
from applications pending at the time the 1975 Agreement was
executed – of which there are none; and (2) from applications
filed after the execution of the 1975 Agreement that cover the
technology developed by Ariel in conjunction with Instinet and
Datasynteks, which does not include technology developed after
June 30, 1976 based on the undisputed facts.  Ariel, therefore,

has no rights under the 1975 Agreement in any technology developed by Instinet after June 30, 1976.  Instinet's second prayer for relief is granted.

In its third and fourth prayers for relief, Instinet requests the Court to declare that, contrary to Ariel's assertion in its June 2008 demand letter, Ariel has no rights in technology that comprises Instinet's current computerized securities trading platform.  As previously stated, the 1975 Agreement provides Ariel certain rights to exploit the technology that comprised the Ariel System, Instinet System, and Instinet II System in existence as of 1976.  That technology may be far obsolete and likely has no commercial value, but Ariel nonetheless has a right to exploit that technology as set forth in the 1975 Agreement.  It was not adequately addressed in the parties' papers whether the parties' technology from 1976 continues to form a component of Instinet's current system. Ariel's counsel claimed as much at oral argument, and there is insufficient information in the present record for the Court to rule to the contrary.  Construing the record evidence in the light most favorable to Ariel, the non-movant, it remains an issue of fact whether Ariel has right to exploit some, albeit insignificant, component of Instinet's system as it exists today.  Summary judgment is denied in that respect.

## C. Laches

Instinet further argues that Ariel's claim to enforce its alleged rights under the 1975 Agreement is barred by laches.

Laches is an equitable defense that "may operate as an estoppel against the assertion of a right." 31 Williston on Contracts § 79:11 (4th ed. 2009). "The defense of laches bars a claim when a defendant has suffered prejudice because of a plaintiff's unreasonable and inexcusable delay in bringing the claim." Legislator 1357 Ltd. v. Metro-Goldwyn-Mayer, Inc., 452 F. Supp. 2d 382, 391 (S.D.N.Y. 2006). This involves "a fact-intensive inquiry into the conduct and background of both parties to determine the relative equities." United States v. Portrait of Wally, No. 99 Civ. 9940, 2002 WL 553532, at *22 (S.D.N.Y. Apr. 12, 2002).

The Court declines to address the issue of laches. The Complaint in this matter seeks a declaratory judgment that addresses solely Ariel's rights in Instinet's current technology under the relevant agreements. The issue of laches goes one step further; that is, if Ariel in fact has such rights, Instinet asks to Court to address whether they are enforceable. The Court will not expand the scope of the action by addressing this extraneous issue.

## III. CONCLUSION

The Court holds that the 1975 Agreement is integrated, unambiguous, and terminated the parties' prior agreement in its entirety. The 1975 Agreement did not provide Ariel perpetual rights to technology developed by Instinet. The unambiguous language of the 1975 Agreement and the undisputed facts limit Ariel's rights in the computerized securities trading technology developed by Instinet to the technology developed on or before June 30, 1976, the date the working relationship between Ariel and Instinet ceased. Ariel's first and second prayers for relief are granted. Because it remains an issue of fact whether Instinet's current securities trading platform still incorporates components of the roughly 35-year-old computer technology to which Ariel has licensing rights under the 1975 Agreement, Instinet's third and fourth prayers for relief are denied.

SO ORDERED.

Dated:  New York, New York
        March 5, 2010

                              _____
                              JOHN F. KEENAN
                              United States District Judge