```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
INSTINET INCORPORATED, INSTINET          :
HOLDINGS INCORPORATED, INSTINET          :
GROUP, LLC, and INSTINET, LLC,           :
                                         :
                          Plaintiffs,    :
                                         :
            – against –                  :
                                         :
ARIEL (UK) LIMITED,                      :
                                         :
                          Defendant.     :
------------------------------------------------------------ X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Sept. 20, 2012

No. 08 Civ. 7141 (JFK)

OPINION AND ORDER

APPEARANCES

    For Plaintiffs Instinet Incorporated, Instinet Holdings Incorporated, Instinet Group, LLC, and Instinet, LLC:
        ORRICK, HERRINGTON & SUTCLIFFE LLP
        By:    Robert L. Sills

    For Defendants Ariel (UK) Limited:
        Michael J. Little

**John F. Keenan, United States District Judge:**

    This declaratory judgment action arises from a dispute regarding the scope of defendant Ariel (UK) Limited's ("Ariel") rights in the computerized securities trading software developed by Plaintiffs Instinet Incorporated, Instinet Holdings Incorporated, Instinet Group, LLC, and Instinet, LLC (collectively, "Instinet"), pursuant to a series of licensing agreements signed in the 1970s. The Court previously granted Instinet's motion for summary judgment with respect to its first and second claims for declaratory judgment, but denied Instinet's motion with respect to its third and fourth claims for declaratory judgment because the parties

had not adequately addressed the question whether Instinet's current securities trading platform incorporates know-how or patents in which Ariel possesses licensing rights. *See Instinet Inc. v. Ariel (UK) Ltd.*, No. 08-CV-7141 (JFK), 2010 WL 779324, at *9 (S.D.N.Y. Mar. 5, 2010). They have now done so.

Instinet renews its motion for summary judgment with respect to its remaining claims. For the reasons that follow, the motion is granted.

## I.  BACKGROUND

The following facts are taken from the parties' Local Civil Rule 56.1 Statements submitted in connection with the instant motion (which incorporate by reference the Local Civil Rule 56.1 Statements submitted in connection with Instinet's prior motion for summary judgment), the affidavits submitted in connection with the instant motion, and the exhibits attached thereto. Unless otherwise noted, the facts are undisputed.

### A.  THE PARTIES

Instinet is successor in interest to Institutional Networks Corporation, which was founded in 1969 to develop a computerized trading system for securities. *Instinet*, 2010 WL 779324, at *1. Through its various entities, Instinet continues to operate an alternative securities trading system and uses its computerized network to match buyers and sellers of securities. (Pls.' L. Civ. R. 56.1 S. ("Pls.' Nov. 2011 56.1 S.") ¶ 1, Nov. 29, 2011, ECF No. 56.)

Ariel is a British company formed in 1971 by a group of London-based merchant banks to establish a computerized trading system that could trade blocks

of stock between large institutions. (Pls.' L. Civ. R. 56.1 S. ("Pls.' Sept. 2009 56.1 S.) ¶ 1, Sept. 2, 2009, ECF No. 22.)

B.  CREATION OF THE INSTINET SYSTEM AND THE ORIGINAL INSTINET II SYSTEM

In or around 1970, Instinet obtained both European and American patents on an early computerized securities trading system (the "Instinet System"). At around the same time, Ariel was attempting to develop its own trading system (the "Ariel System"). Concerned that Instinet's European patents could pose an obstacle to the development of the Ariel System, Ariel entered into a licensing agreement (the "1972 Agreement") with Instinet on August 11, 1972, under which Ariel could develop its own computerized securities trading system based on the design of the Instinet System. In return, Ariel agreed to pay Instinet licensing fees and royalties. Both parties agreed to disclose to each other all improvements relating to the systems they developed during the term of the agreement, regardless of whether the improvements were patentable. The 1972 Agreement had a term of 14 years, subject to certain conditions that would provide Ariel licensing rights under the agreement in perpetuity. *See Instinet*, 2010 WL 779324, at *1.

After the execution of the 1972 Agreement, Ariel and Instinet began working together to develop a new version of the Instinet System (the "Original Instinet II System"). *Id.* According to Ariel, its role in the joint effort was to "develop and deliver to Instinet the definitions and the specifications of the messaging between the information backbone and the trading engine." (Df.'s Sept. 2009 56.1 S. ¶ 21.)

C. THE 1975 AGREEMENT AND CHANGES TO INSTINET'S TRADING PLATFORM

On or about December 24, 1975, Ariel sent to Instinet a proposal to renegotiate the 1972 Agreement. Under the terms of the proposal, Ariel would pay Instinet $175,000.00, and in exchange would receive a non-exclusive license in all those territories where Instinet had patents granted or pending, as well as full and unencumbered access to and right to make use of the Original Instinet II System and documentation on the same terms as though the 1972 Agreement were still in force. This proposal was subject to the condition that the parties' attorneys would "draw preceding agreement and conditions." *See Instinet*, 2010 WL 779324, at *1. On December 26, 1975, Instinet accepted the offer and urged Ariel's lawyers to send confirming papers. *Id.* at *2.

In or about April 1976, the parties finalized their agreement by signing a written contract with an effective date of December 31, 1975 (the "1975 Agreement"). *See id.* The 1975 Agreement provided that the 1972 Agreement "be treated as terminated" and "the obligations of both parties . . . shall wholly cease on that date." (Sillis Decl. Ex. I (the "1975 Agreement") ¶ 4(1), Sept. 2, 2009, ECF No. 17.) The 1975 Agreement also granted Ariel "a non-exclusive license in respect of the Patents[,] the Future Patents[,] and the Know-How . . . together with the right to grant sub-licenses thereunder." (*Id.* ¶¶ C, 5(1)–(2).) The parties defined the "Know-How" to mean:

> all know-how[,] documentation[,] information[,] procedures[,] knowledge[,] experience[,] and data . . . developed up to [December 31, 1975] by or for Instinet or Ariel and which relates in any way to the Instinet System[,] the Ariel System[,] and the Instinet Two System,

– 4 –

> [or] . . . developed after [December 31, 1975] but prior to [June 30, 1976] by Instinet in conjunction with Ariel and Datasynteks and which relates in any way to the Instinet Two System so far in each case as the same is for the time being secret or confidential.

(*Id.* at 3.)  In the 1975 Agreement, the parties also defined the term "Patents" and "Future Patents."  "Patents" was defined to include "all patents or similar forms of protection in any part of the world of which Instinet or Ariel is the proprietor at the time of signature hereof and which relate in any way to the Instinet System[,] the Ariel System[,] and the Instinet Two System." (*Id.*)  "Future Patents" referred to:

> all applications for Patents or similar forms of protection in any part of the world made by or on behalf of Instinet or Ariel and pending at the time of signature hereof to the extent only that the same cover the Instinet System[,] the Ariel System[,] and the Instinet Two System . . . and all such applications in any part of the world which may hereafter be made by or on behalf of Instinet (or by or on behalf of Ariel . . . ) and any patents granted pursuant to any such applications as are mentioned above.

(*Id.* at 3–4.)

Under the 1975 Agreement, Ariel was "entitled to retain all materials, plans, programs, information, and documentation[,] including the Instinet Documentation supplied by Instinet at any time on the basis that Ariel shall continue after [December 31, 1975] to operate the Ariel System but without payment of any kind to Instinet." (*Id.* ¶ 4(3).)  Ariel was also granted "full and unencumbered access to and the right to make use of the Instinet Two System and all documentation programs and data relating thereto without payment of any kind." (*Id.* ¶ 5(4).)  The 1975 Agreement reflected Ariel and Instinet's agreement that "each of them is free to operate and to license others to operate computerized communications systems in any part of the world as contemplated herein." (*Id.* ¶ 6.)

On June 30, 1976, David Manns, one of the creators of the Original Instinet II System, left his employment at Ariel and soon began working at Instinet. Over the next three decades, Manns would continue to work on the improvements to the Original Instinet II System (Decl. of Michael J. Little ("Little Decl.") Ex. E 21:22–22:23, Nov. 29, 2011, ECF No. 59,) but as the Court noted in its ruling on Instinet's prior motion for summary judgment, "it is undisputed that David Mann's departure from Ariel to Instinet terminated the working relationship between the two firms," *Instinet*, 2010 WL 779324, at *2.

In September 1976, Instinet began operation of the Original Instinet II System, which was based on new software (the "1976 Software") different from that which operated the Instinet System. (Declaration of Chris Rogers ("Rogers Decl.") ¶ 4, Nov. 29, 2011, ECF No. 55.) The Original Instinet II System was incrementally modified over the next three decades, resulting in a modified system (the "Modified Instinet II System") of which the 1976 Software remained a part. (Little Decl. Ex. E 22:4–23.)

In 2005, Instinet began development of a new system (the "Current Instinet System") developed by its Chief Technology Officer, Chris Rogers. (Rogers Decl. ¶¶ 8, 10–11.) The Current Instinet System was based on new software (the "2005 Software") that was written in a different programming language than the 1976 Software and contains "algorithms and programming logic" different from its predecessor systems. (*Id.* ¶¶ 11, 13–14.) According to Instinet, a replacement of the Modified Instinet II System was necessary because the 1976 Software was designed

to run on the now-obsolete Digital Equipment PDP-II computer system, which "has not been manufactured or supported since the mid-1990s." (Pls.' Nov. 2011 56.1 S. ¶ 4.)  Instinet asserts that even "if a copy of the 1976 Software could be located, its components could not be run on any modern computer." (Pls.' Nov. 2011 56.1 S. ¶ 4.)

Ariel claims that the Current Instinet System continues to integrate components of the Original Instinet II System and disputes Instinet's characterization of Instinet's various systems as consisting primarily of software.  In a deposition taken in connection with this litigation, David Manns testified that the Original Instinet II System consisted of "an engine," "a backbone network," and "front end systems and virtual display screens for traders." (Df.'s L. R. 56.1 S. ("Df.'s Nov. 2011 56.1 S.") ¶ 2, Nov. 29, 2011, ECF No. 60.)  The 1976 Software, in Ariel's view, was just one component of the Original Instinet II System.  Additionally, Ariel provides quotations of statements allegedly made by Instinet employees to three online news sources to support its claim that the Current Instinet System continues to use technology from the Original Instinet II System. (Df.'s Mem. Opp. Mot. Summ. J. 2–4, Nov. 29, 2011, ECF No. 58.)  Contrary to the assertions of Instinet, Ariel contends that the 1976 Software could be run on modern computer systems through software emulation of the PDP-II computer system. (Df.'s Nov. 2011 56.1 S. ¶ 4.)  Ariel, however, does not contend that 1976 Software itself is in use by Instinet at the present time.

D.   LITIGATION CONCERNING ARIEL'S RIGHTS IN THE CURRENT INSTINET SYSTEM AND THE 2005 SOFTWARE

1.   ARIEL'S DEMAND LETTERS AND PRIOR LITIGATION IN THIS COURT

In 1996, Ariel sent letters to both Instinet and Reuters, the majority owner of Instinet at the time, requesting a meeting with their representatives regarding the status of its rights pursuant to the 1975 Agreement. Instinet declined Ariel's request. In October 2003, Ariel engaged Origin Limited ("Origin") to provide an opinion on the validity of Ariel's intellectual property rights. On March 22, 2005, Origin, on behalf of Ariel, sent a demand letter to Instinet and Reuters, requesting "assurance that [they] will honour [their] obligations to Ariel" under the 1975 Agreement. (Decl. of Robert L. Sills ("Sills Decl.") Ex. K at 4, September 2, 2009, ECF No. 17.) Representatives for Instinet and Reuters again rejected Ariel's demand.

Ariel subsequently brought an action in this Court against Instinet and others, seeking declaratory relief as well as money damages for copyright infringement and breach of contract, based on Instinet's alleged use of Ariel's technology pursuant to the 1975 Agreement. The action was dismissed with prejudice on the grounds that defendant held licenses to use Ariel's technology. *See Ariel (UK) Ltd. v. Reuters Group PLC*, No. 05 Civ. 9646, 2006 WL 3161467 (S.D.N.Y. Oct. 31, 2006), *aff'd* 277 F. App'x 43 (2d Cir. 2008). The Court also declined to exercise supplemental jurisdiction over the remaining state law claims, dismissing them without prejudice. *Id.* at *10–11.

In June 2008, Ariel sent another demand letter (the "2008 Demand Letter") to Instinet, claiming that it has a "right of ingress" in the Current Instinet System based on the 1975 Agreement. (Sills Decl. Ex O at 1.)  Ariel asserted that this "right of ingress" in the technology used by Instinet in June 2008 was "contemplated in the perpetual reciprocal license Agreements . . . envisioned in the 1972 Agreement and imputed explicitly and implicitly into the 1975 Agreement by manner of the Cable Agreement." (*Id.* at 1–2.)  Additionally, Ariel demanded that Instinet "supply a list of patents, extant and applied for that relate in any way to the Instinet II technology and that Instinet . . . execute short form agreements enabling Ariel to commercially sub-license [the Current Instinet System] to companies operating in the matching technology space." (*Id.* at 2.)

On August 11, 2008, Instinet commenced this action seeking a declaratory judgment addressing the rights and obligations of the parties.  Instinet petitioned the Court to declare that:

(1) "the 1975 Agreement terminated the 1972 Agreement in its entirety;"
(2) "pursuant to the 1975 Agreement, the technology and software being licensed to Ariel is limited to such technology and software as it existed no later than June 30, 1976;"
(3) "Ariel has no rights in or to Instinet's current technology or software;" and
(4) "Ariel does not have any of the rights claimed in the Demand Letter, whether pursuant to the 1972 Agreement, the 1975 Cable Agreement, the 1975 Agreement, or otherwise."

(Compl. ¶ 26(a)–(d), Aug. 11, 2008, ECF No. 1.)  On November 5, 2008, Ariel filed an action in Supreme Court, New York County, asserting similar claims to those made in the June 2008 demand letter. *See Ariel (UK) Limited v. Thompson Reuters Corp.*,

Index No. 08603190 (N.Y. Sup. Ct. filed Nov. 5, 2008). That action has been stayed, upon consent, pending the resolution of the instant matter. (*See* Sills Decl. Ex. Q.)

    2.    INSTINET'S FIRST MOTION FOR SUMMARY JUDGMENT

On September 9, 2009, Instinet filed its first motion for summary judgment, asserting that the 1975 Agreement is both integrated and unambiguous, and thus it is entitled to all four claims for declaratory relief as a matter of law. Instinet also argued that Ariel's claims would be barred under the doctrine of laches. The Court held that Instinet was entitled to summary judgment with respect to the first and second claims for declaratory relief and that the parties had not adequately addressed whether there were genuine issues of fact material to Instinet's third and fourth claims for declaratory relief. *Instinet*, 2010 WL 779324, at *6–9.

    3.    ARIEL'S MOTION TO AMEND

In July 2010, Ariel demanded that Instinet produce the source code and documentation for the 1976 Software as it existed on June 30, 1976. Instinet admitted that it did not have a copy of the 1976 Software as it existed on June 30, 1976, or documentation "in its possession, custody, or control." (Bainton Decl. Exs. D, F, Jan. 12, 2011, ECF No. 47.) Thereafter, Ariel moved for leave to amend its answer to assert a defense of rescission with respect to the 1975 Agreement. On September 26, 2011, the Court denied Ariel's motion on the grounds of undue delay and futility. *Instinet Inc. v. Ariel (UK) Ltd.*, No. 08 Civ. 7141 (JFK) (RLE), 2011 WL 4444086, at *3–4 (S.D.N.Y. Sept. 26, 2011). Nearly two months later, Instinet filed its renewed motion for summary judgment.

## II.  DISCUSSION

A.  SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment where the evidence, viewed in the light most favorable to the non-movant, shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Vacold LLC v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2010) (citing *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)).  The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party meets that burden, the opposing party must then come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he substantive law of the action [determines] which facts are material," and "'[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Golden Pac. Bancorp. v. FDIC*, 375 F. 3d 196, 200 (2d Cir. 2004) (quoting *Anderson*, 477 U.S. at 248).

B.  THE PARTIES' EVIDENTIARY OBJECTIONS

In deciding a motion for summary judgment, the Court may consider only evidence that can be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is

competent to testify on the matters stated.'" *DiStiso v. Cook*, --- F.3d ----, 2012 WL 3570755, at *2 (2d Cir. Aug. 21, 2012) (quoting Fed. R. Civ. P. 56(c)(4)). Therefore, the Court must resolve two evidentiary objections raised in the parties' moving papers before considering the merits of the instant motion.

    1.    INSTINET'S OBJECTION TO ARIEL'S RELIANCE ON PUBLIC STATEMENTS OF CHRIS ROGERS AS "INADMISSIBLE HEARSAY"

Instinet argues that the quotations taken from online news sources by Ariel are inadmissible hearsay that the Court may not consider. These articles are taken from two business news websites: Wall Street & Technology, http://www.wall-streetandtech.com, and Advanced Trading, http://www.advancedtrading.com/. Because these articles are statements by declarants while not "testifying at the current trial or hearing," and are offered "to prove the truth of the matter asserted in those articles" (i.e., that Instinet employees made the statements quoted in the articles), these articles are hearsay. Fed. R. Evid. 801(c). None of the exceptions to the rule against admissibility of hearsay apply to these articles, and therefore these articles are inadmissible. *See* Fed. R. Evid. 802; *Tokio Marine & Fire Ins. Co. v. Rosner*, 206 F. App'x 90, 95 (2d Cir. 2006).

Because the news articles are inadmissible, the quotations contained therein are not admissible even if they might independently fall within an exception to the hearsay rule. *See* Fed. R. Evid. 805; *United States v. Payne*, 437 F.3d 540 (6th Cir. 2006) ("In order to admit an out-of-court statement that is nested within another, Rule 805 requires that *both* statements be admissible."). Therefore, Ariel may not

rely on these quotations as independent evidence that there is a genuine dispute as to an issue of material fact.

    2.    DEFENDANT'S OBJECTION TO THE DECLARATION OF CHRIS ROGERS AS LACKING A BASIS IN PERSONAL KNOWLEDGE

Ariel objects to the admissibility of portions of the Rogers Declaration under Federal Rule of Evidence 602, arguing that these portions are not based on Rogers's personal knowledge because he attests that he never worked directly with the 1976 Software that formed the core of the Original Instinet II System. (Df.'s Nov. 2011 56.1 S. ¶ 3.) Instinet contends that Rogers was directly involved in the development of the Current Instinet System and therefore is competent to give testimony that the Current Instinet System was "built from the ground up" and integrates none of the technology from the Original Instinet II System. (Pls.' Reply Mem. Mot. Summ. J. 8–9, Nov. 29, 2011, ECF No. 61.)

According to the Rogers Declaration, Rogers has served as Instinet's Chief Technology Officer since 2007. (Rogers Decl. ¶ 2.) Between 2003 and 2007, Rogers worked as Instinet's Chief Software Architect. (*Id.* ¶¶ 2, 6.) When he originally began working at Instinet, Rogers "worked on the software and technology for a newly-acquired subsidiary of Instinet known as [Island], which, like Instinet, operated an electronic trading platform for securities," but which had developed its competing software platform independently. (*Id.* ¶ 6.) Rogers admits that he has not worked directly with the 1976 Software that formed the basis of the Original Instinet II System and that he has "never examined the code of any version of the 1976 Software in the course of [his] work." (*Id.* ¶¶ 7, 13.)

Ariel urges the Court to reject Rogers's testimony that the Current Instinet System contains no components of the 1976 Software on the grounds that Rogers has no personal knowledge about the code that comprised the 1976 Software. However, Ariel does not argue that Rogers lacks personal knowledge about the development of Current Instinet System in a "clean room" environment, or that he lacks personal knowledge to testify that the Current Instinet System "is an original work and is not a modification of the code of any other system." (*See* Rogers Decl. ¶¶ 13, 14.) This testimony is sufficient to establish that Rogers based his statement that the "algorithms and programming logic" utilized in the Current Instinet System is "in no way derived from . . . the 1976 Software" on his own personal knowledge, especially in light of the undisputed evidence on the record that the 1976 Software was written in an entirely different programming language. (Rogers Decl. ¶¶ 8, 14; Df.'s Nov. 2011 56.1 S. ¶ 6.)

C.   APPLICATION TO PLAINTIFFS' MOTION

In ruling on Plaintiffs' prior motion for summary judgment, this Court held that "the 1975 Agreement is integrated, unambiguous, and terminated the parties' prior agreement in its entirety." *Instinet*, 2010 WL 779324, at *8. Under the terms of the 1975 Agreement, "Ariel's rights in the computerized trading technology developed by [Instinet were] limit[ed] to the technology developed on or before June 30, 1976, the date the working relationship between Ariel and [Instinet] ceased." *Id.*

In its third claim for declaratory relief, Instinet seeks a declaration that Ariel has no rights in or to Instinet's current technology or software. In its fourth claim for declaratory relief, Instinet seeks a declaration that Ariel does not have any of

the rights claimed in the 2008 Demand Letter, "whether pursuant to the 1972 Agreement, the 1975 Cable Agreement, the 1975 Agreement, or otherwise." (Compl. ¶ 26(d).) The 2008 Demand Letter contains two distinct demands. Ariel claims that that it is entitled to a "right of ingress" in the Current Instinet System, and that Instinet is obligated to "supply a list of patents, extant and applied for, that relate in any way to the Instinet II technology" and "execute short form agreements enabling Ariel to commercially sub-license [these patents] to companies operating in the matching technology space." (Sills Decl. Ex. O at 2.)

Instinet contends—and Ariel agrees—that the question whether the Current Instinet System continues to employ technology from the Original Instinet II System is determinative of whether Instinet is entitled to summary judgment with respect to the third and fourth claims for declaratory relief.

In support of its claim, Instinet offers undisputed evidence from Rogers that the code forming the Current Instinet System was built from the "ground up" in a clean-room environment, and that this overhaul of Instinet's trading platform was necessary in light of the dramatic technological changes that had occurred in the three decades that followed the 1975 Agreement. In support of its position that the Current Instinet System contains no components of the Original Instinet II System, Instinet also relies on deposition testimony from Michael J. Little, Ariel's current owner, and David Mann. At his Civil Rule 30(b)(6) deposition, Little testified that he had no "basis upon which to testify that as a technical matter the current Instinet system and the [1976 Software] have any features in common." (Sills Decl.,

Ex. D at 211, 216.) The evidence marshaled by Instinet clearly establishes that, though its purpose is to match securities trades (a purpose shared with all predecessor systems of Instinet systems), the Current Instinet System utilizes no software or other technology developed for use in the Original Instinet II System.

Ariel speculates about Rogers's motivation and credibility in giving testimony about the development of the Current Instinet System, but provides no evidence to refute Rogers's assertion that the technology employed in implementing the Original Instinet II System is no longer used in the Current Instinet System. Ariel relies heavily on the online news articles discussed above to call Rogers's credibility into question, but even if Ariel could present admissible evidence establishing that Instinet's employees made the statements quoted in those articles, the quotations would neither call into question the veracity of the Rogers Declaration, nor support Ariel's contention that the Current Instinet System incorporates elements of the Instinet II System as it existed prior to June 30, 1976. In the first article to which Defendant refers, Rogers is reported to have said that:

> [Instinet's] primary project, which should be completed soon, is a rewrite of what we call the "Core," which is the fundamental technology that touches pretty much everything Instinet does. With this new Core we will be a much more efficient technology organization, as it will serve as the underpinning of our global matching engines, algorithms and front ends.

(Df.'s Mem. Opp. 2.) Defendant argues that this statement "cannot be reconciled" with Rogers's statement that the Current Instinet System "is a new system designed and built from the ground up." (*Id.* (quoting Rogers Decl. ¶ 11).) Defendant's argument that these two statements are irreconcilable is conclusory.

In fact, Plaintiffs' development of a rewritten or rebuilt "Core" in 2007 would support, rather than weaken, Plaintiffs' argument that the Current Instinet System contains no computer code or other technology developed for the 1976 Software. Additionally, from the assertion that Rogers's "primary project" as of 2007 was a rewrite of the prior "Core," it does not follow that this was the only difference between the Instinet II System and the Current Instinet System, the development of which Rogers began in 2005. Finally, even if the Current Instinet System incorporated some features that had been integrated into the Instinet II System as it existed when Instinet made the decision to deploy new technology, Defendant does not claim that any of these features were components of the Instinet II System as it existed prior to June 30, 1976. For all these reasons, Defendant's contention that the above quotation contradicts the Rogers Declaration is unsound.

The other quotations upon which Defendant relies also do not contradict Rogers's statements about the creation of the Current Instinet System. In opposing the Plaintiffs' current motion for summary judgment, Defendant refers to Rogers's 2008 statement that Instinet had combined the technology of one competing platform "with Instinet's algorithms and smart routing capability." (Df.'s Mem. Opp. 3.) This statement would support Defendant's position only if there was some evidence that the "algorithms and smart routing capability" to which Rogers allegedly referred were components of the Instinet II System as it existed prior to June 30, 1976. Defendant also refers to Instinet Group employee Brian Nigito's 2011 statement that the Current Instinet System contains a matching engine based

on another competing trading platform, which was combined with a "text based terminal" similar to one used previously. (*Id*.) This statement would contradict the evidence adduced by Plaintiffs only if the use of a "text-based terminal" could be considered as part of the "technology and software" unique to the Instinet II System or, more specifically, the 1976 Software. Defendant provides no explanation for how the use of a "text-based" terminal undermines Plaintiffs' position that the technology underlying the Current Instinet System was built "from the ground up."

Much of the evidence marshaled by Ariel to support its argument that there is a genuine dispute on this point is equivocal at best, and at worst damaging to Ariel's position. For example, at the time of his April 2009 deposition, the last time Mann had examined the source code for any Instinet system was in August 2006, and he admitted having no personal knowledge about the source code used in the Current Instinet System, or about the hardware on which it runs. (2009 Little Decl., Ex. E ("Manns Dep.") 45:7–15, 46:10–14.) Though Ariel's counsel had represented that, at this deposition, Manns would testify regarding "the alleged similarities between the current Instinet system" and the Original Instinet II System, Mann was unable to identify any similarities and in fact agreed that it "certainly is true" that the 1976 Software had been "rewritten completely" in the years between 1976 and 2006. (*Id.* 47:14–21.)

Ariel's argument that the Current Instinet System shares certain common features with the Original Instinet II System, such as the use of a securities trading engine, a backbone network, and a display system (including the "look and feel" of a

display system), does not change this result. Ariel's rights in the Original Instinet II System are limited to:

(1) "a license to use and grant sublicenses to the "Know-how" and "Patents" underlying the [Original Instinet II System];"

(2) "the right to exploit the patents obtained by Instinet from applications pending at the time the 1975 Agreement was executed—of which there are none;" and

(3) "the right to exploit the patents obtained by Instinet from applications filed after the execution of the 1975 Agreement that cover the technology developed by Ariel in conjunction with Instinet and Datasyntecks, which does not include technology developed after June 30, 1976 based on the undisputed facts"

*Instinet*, 2010 WL 779324, at *7. Therefore, assuming Ariel is correct in its contention that the Current Instinet System shares high-level structural features with the Original Instinet II System, it has not shown that any of these features were "Know-how" or patented technology in which Ariel has a right under the 1975 Agreement.

Based on the facts discussed above, and drawing all reasonable inferences in favor of Ariel, the Court holds that Instinet is entitled to a declaration that Ariel has no rights in or to Instinet's current technology or software.

### III. CONCLUSION

For the above stated reasons and for the reasons set forth in the Court's Opinion and Order dated March 5, 2010, the Court holds that Plaintiffs are entitled to summary judgment with respect to their third and fourth claims for declaratory relief. The Court GRANTS declaratory judgment in favor of Plaintiffs, and DECLARES that:

      (1)    Ariel has no rights in or to Instinet's current technology or software; and

      (2)    Ariel does not have any of the rights claimed in the Demand Letter, whether pursuant to the 1972 Agreement, the 1975 Cable Agreement, the 1975 Agreement, or otherwise.

Because the grant of summary judgment in favor of Plaintiffs forecloses the relief requested by Defendant in its Answer, the Court denies Defendants' claims for relief. The Clerk of Court is directed to close this case.

SO ORDERED.

Dated:    New York, New York
             September 20, 2012

                                              John F. Keenan
                                              United States District Judge